70 S.W.3d 2 (2002)
In the Interest of T.N.H., a minor child.
No. ED 79374.
Missouri Court of Appeals, Eastern District, Division Five.
January 15, 2002.
Rehearing Denied March 13, 2002.
*3 Kayla Vaughan, Legal Services of Eastern, St. Louis, MO, William P. Grant, Missouri Guardian Ad Litem, Clayton, MO, for Appellant.
Robin Ransom Vannoy, Family Court of St., Louis County, Richard J. Childress, Div. Of Family Serv., Louis, MO, for Respondent.
PAUL J. SIMON, Judge.
Valerie Abbott (Mother) appeals the denial of her Rule 74.06(b)(4) motion to vacate or set aside the judgment placing her daughter, T.N.H., in protective custody. On appeal, Mother contends that the trial court erred in failing to: (1) vacate or set aside the August 28, 1998 judgment because it was void ab initio in that neither notice nor summons was issued to her in derogation of the requirements of Rule 115.01(c) and Section 211.101.2 RSMo (2001) (all further references herein shall be to RSMo 2001 unless otherwise indicated); (2) vacate or set aside the August 28, 1998 judgment because the petition failed to state a claim against her and failed to meet the requirements of Rule 114.01(b)(3) in that it alleged only that the whereabouts of Mother were unknown and said allegation was refuted by uncontroverted evidence; and (3) grant her Motion to Rescind Orders pursuant to the Interstate Compact on Placement of Children (ICPC) because Section 210.610(sic) [210.620] Article VIII(a) renders said law inapplicable to parents and because mandates of the *4 ICPC do not have to be followed when a child is returned to his or her parent. We affirm.
We will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). When reviewing the decision of the trial court, we consider the facts and reasonable inferences therefrom in the light most favorable to the judgment. Id.
The record reveals that Mother and Lawrence Abbott (Lawrence) were married on February 14, 1986 in Virginia Beach, Virginia, and separated on January 27, 1987. One child, Betty Abbott (Betty), was born of the marriage on September 6, 1986, and Mother and Lawrence last engaged in sexual intercourse on November 20, 1988.
In the summer of 1988, Mother became involved in a sexual relationship with Darrell Harrell (Darrell) who was in the Navy and stationed in Virginia Beach. Thereafter, Mother learned she was pregnant and phoned Darrell's mother, Hazel, advising her that she was uncertain as to whether she wished to have a baby. On August 28, 1989, T.N.H. was born to Mother, who thought that "it was a possibility that [Darrell] could be [the] father."
A month after T.N.H. was born, Darrell married Marlene McClendon, a Texas resident, in Virginia. After the marriage, Darrell remained stationed in Virginia while Marlene lived in Texas. In May
1990, Marlene visited Darrell for two weeks. During this time, Mother allowed Darrell custody of T.N.H. for five days, after which Darrell and Marlene drove to Mother's apartment to return T.N.H. Darrell walked T.N.H. to Mother's door while Marlene waited in the car. Darrell returned twenty minutes later, still with T.N.H., and told Marlene that Mother was inside the apartment and that she would not answer the door. He further told her that T.N.H. had started crying and that he had "[made] noise." Neighbors overheard the commotion and called the police, who arrived on the scene and told Darrell that either he had to leave with T.N.H. or that they would take her.
Darrell and Marlene left Virginia for Texas and took T.N.H. with them. One month later, in June of 1990, Mother called Marlene looking for T.N.H. Marlene told Mother that T.N.H. was with her and Mother asked when Marlene was "bringing her back." Marlene replied: "Why would I want to return T.N.H. when [you do] not want her?" Mother responded: "Well you're just gonna keep her, you know."
On July 6, 1990, Mother filed a petition seeking custody of T.N.H. in the Virginia Beach juvenile court. The petition named Darrell as T.N.H.'s father and summons was directed to him at "USS Saginaw Pr. 14 S Little Crk Va. Beach, Va." Said summons was returned indicating: "Not found-Out to sea." Mother could not contact Hazel because she was unable to locate Hazel's number, which was lost when she was evicted from her apartment. Mother approached legal services in Virginia for aid in retrieving T.N.H., but they could not help her because she did not know T.N.H.'s whereabouts and T.N.H. was not located in Virginia. Mother next went to the police to see if she could file kidnapping charges against Darrell, but she was advised that they could not help her because Darrell was allegedly T.N.H.'s father.
In March of 1991, Darrell, Marlene and T.N.H. moved to St. Louis. Between November of that year and March of 1993, Marlene made several attempts to reach *5 Mother at her mother's home in Norfolk, Virginia. Marlene reached Mother once in 1992, updated her as to T.N.H.'s condition, and told her that she could call Marlene collect once a month to talk to T.N.H. Both Mother and Betty talked to T.N.H. over the phone, but after the conversation, Mother never called to speak to T.N.H. Two years later, Marlene's phone number changed.
On November 4, 1996, Marlene and Darrell divorced. T.N.H. continued living with Marlene until June of 1998, when T.N.H. began residing with Hazel.
On June 17, 1998, a juvenile officer placed T.N.H. in temporary protective custody with the Division of Family Services (DFS) pursuant to Section 210.125 and Rule 111.12. At this time and at all times hereinafter mentioned, T.N.H. was allowed to remain in the physical custody of Hazel. The commissioner found that conditions requiring protective custody existed and recommended that T.N.H. remain in the legal custody of DFS. An attorney was appointed guardian ad litem (GAL) for T.N.H. and the commissioner's findings were adopted and confirmed by the judge.
On July 6, 1998, the Deputy Juvenile Officer (DJO) filed a protective custody petition alleging that T.N.H. was in need of care and treatment within provisions of Section 211.031.1(1) in that Darrell neglected to provide proper support and care by leaving her with Hazel, who was not at the time entitled to legal or physical custody of T.N.H., and in that he left her without any arrangement to visit or communicate with T.N.H. The petition further alleged that Darrell was the father of T.N.H. and that his residence was: "c/o [Hazel] 2230 Berwyn St. Louis, Mo 63136" and that Mother was T.N.H.'s mother and her "whereabouts [were] unknown." The hearing on the petition was set for August 10, 1998, and summons was sent via certified mail to Darrell "c/o Hazel Taylor" at the Berwyn Street address.
At the hearing, a letter from the Children's Services Director was presented which indicated that Mother's address was unknown, Darrell was unable to provide proper care and support for T.N.H. due to his drug addiction and alleged homeless status, Darrell recently was in drug rehabilitation and his whereabouts were unknown, Hazel and her husband Melrose (collectively the "Taylors") provided a "very comfortable and loving" home for T.N.H., and that there was "a lot of support" for T.N.H. from her extended family. Hazel testified that she was the paternal grandmother of T.N.H., that Darrell left T.N.H. in her care, and that she knew Mother was in Virginia Beach, but did not have her specific address.
Following the hearing, the commissioner entered findings and recommendations finding that the allegations of the petition were true and supported by clear, cogent and convincing evidence and that T.N.H. came within the provisions of Section 211.031.1, and recommending that DFS continue legal custody of T.N.H. Visitation rights were granted to Mother and Darrell subject to approval and supervision by DFS and a permanency review hearing was scheduled for February 3, 1999. No motion for rehearing was filed. The judge adopted and confirmed the commissioner's findings and recommendations on August 28,1998.
At the February 3, 1999 review hearing, the Children's Services Director again indicated by letter that Mother's address was unknown and reported as to T.N.H.'s condition. Following the hearing, the commissioner continued legal custody of T.N.H. with DFS and the judge adopted and confirmed commissioner's findings and recommendations. A further review was set for August 5, 1999.
*6 At the August 5, 1999 review hearing, a third letter from the Children's Services Director was presented, this time indicating that Mother's address was "411 Hill Meadow Dr., Virginia Beach, Virginia." DFS recommended that the court continue jurisdiction over T.N.H. and keep her in the physical custody of Taylor until completion of the guardianship proceedings. The commissioner recommended that legal custody of T.N.H. remain with DFS and ordered the DJO to provide the Taylors with a list of attorneys so that they could institute guardianship proceedings.
After the hearing, copies of the recommendations were mailed to Mother at her address in Virginia Beach. The judge adopted and confirmed the commissioner's recommendations the following day. The next review hearing was scheduled for February 17, 2000.
On January 21, 2000, Mother received a letter from the Taylors' attorney along with a copy of a Petition for Guardianship of T.N.H. On February 4, 2000, Mother filed a financial form in the St. Louis County family court requesting legal representation for the February 17, 2000 review hearing. Said motion was granted and an attorney was appointed to represent her. Mother also phoned Hazel.
At the February 17 review hearing, Mother appeared with her attorney and participated in the hearing. The commissioner recommended continuance of the previous custody orders, and said recommendation was once again adopted and confirmed by the judge. Subsequently, two attorneys with Legal Services of Eastern Missouri entered their appearances for Mother replacing her previous attorney.
On July 25, 2000, Mother filed a Motion to Modify the orders of August 10, 1998, February 3, 1999, and August 5, 1999, which had each been adopted by the February 17, 2000 order, or in the alternative setting aside all orders as void for lack of jurisdiction. Mother argued that: (1) the petition filed on July 8, 1998 erroneously stated that T.N.H. was abandoned by Mother; (2) Mother did not learn of T.N.H.'s whereabouts or of the pendency of proceedings concerning T.N.H. until she received correspondence from the Taylors' attorney in January 2000 regarding the filing of the petition for guardianship; (3) Mother was not served process; (4) Mother never received a service plan in this cause; (5) Mother initiated contact with the court by telephoning from Virginia Beach after learning of the pendency of the guardianship action; (6) Mother filed her answer and affirmative defense to the Taylors' petition for guardianship which was attached as exhibit I; and (7) Mother was deprived of her due process rights by agents of the State of Missouri to her continuing detriment. The record indicates that the petition was filed on July 6, 1998 rather than July 8, 1998 and did not allege that Mother abandoned T.N.H.
On July 31, 2000, Mother filed a Motion to Dismiss for Lack of Jurisdiction alleging that: (1) the August 10, 1998 order by which the court purported to take jurisdiction of T.N.H. was fatally defective in that no judge adopted or confirmed the findings and recommendations of the commissioner; (2) the August 10, 1998, order was not a judgment of the court in that it was not adopted and confirmed by a judge; and (3) Mother was not afforded due process of law in the matter in that a summons was not issued or served upon her.
At the August 8, 2000 hearing on Mother's Motion to Modify and Motion to Dismiss, David Ward (Ward), a child support technician, testified that Mother's name and Virginia Beach address had been in a computer database since May 22, 1997. He further testified that Darrell and Hazel had both received public assistance for *7 T.N.H. There was no testimony that the DJO or DFS workers were aware of Mother's address and the record further indicates that although computer checks were run, they did not disclose Mother's address.
Following the hearing, the court entered among others, an order to DFS to immediately refer the case "to ICPC." The hearing was continued to December 1, 2000 to further consider Mother's motions, protective custody, and the Taylors' petition for guardianship.
On August 18, 2000, Mother filed a Motion for Contempt pursuant to Section 476.110(3) R.S.Mo 1994 against the State of Missouri and DFS alleging that DFS and State of Missouri willfully failed and refused to refer the case to ICPC and arrange visitation. Said motion was denied on September 5, 2000.
On November 22, 2000, Mother filed a Motion to Rescind previous orders requiring referral by DFS to ICPC and arrangement of a psychological evaluation of Mother.
At the December 1, 2000 hearing on Mother's Motion to Modify and Motion to Dismiss, the guardianship and neglect reviews were continued and set for pre-trial conference and review on March 2, 2001. The Judge entered various orders concerning Mother's visitation and psychological evaluations of Mother and Betty. The court further ordered that no child support was required from Mother at the time; that T.N.H. was born during the lawful marriage of Mother to Lawrence and that therefore Lawrence was a necessary party; and that DFS was to diligently search for the whereabouts of Lawrence and immediately inform the DJO's attorney of his address so that a summons could be issued. Additionally, the court ordered DFS to pay Mother $2,450.00 to be delivered to her attorney at Legal Services of Eastern Missouri on or before December 31, 2000, and held that Mother was entitled to receive up to $350.00 per visit starting December 1, 2000.
On January 18, 2001, Mother filed a second motion for contempt, this time alleging that the State of Missouri and DFS violated the December 1, 2000 orders. The motion was continued generally.
On February 21, 2001, Mother withdrew her July 31, 2000 Motion to Dismiss and filed a motion pursuant to Rule 74.06(b)(4), seeking to set aside the Rule 119 Judgement entered on August 10, 1998.
On March 29, 2001, the judge denied Mother's Motion to Rescind the ICPC Order as well as her Motion to Set Aside/Vacate the judgment and ruled that all prior orders of the court were to remain in full force and effect. Cause was continued for pre-trial conference on May 25, 2001.
In her first point on appeal, Mother contends that the court erred in failing to vacate or set aside the August 28, 1998 judgment because it was void ab initio pursuant to Rule 74.06(b)(4) in that she was never notified of the pendency of the case pursuant to Rule 115.01(c) and Section 211.101.2.
A Rule 74.06(b) motion to declare a judgment void is appropriate where the court which rendered said judgment lacked jurisdiction over the subject matter or the parties, or acted in a manner inconsistent with due process of law. Platt v. Platt, 815 S.W.2d 82, 83 (Mo.App.1991).
Mother's reliance on In the Interest of Loveheart, 762 S.W.2d 32 (Mo.banc 1988), for the proposition that T.N.H. could not be placed under protective custody without Mother's first receiving notice is misplaced. Loveheart is a termination of parental rights case whereas this case is one for protective custody. In a protective *8 custody proceeding pursuant to Section 211.031.1(1) and Rule 111.12, the family court's original jurisdiction is premised on a child being found "within the county" and alleged to be in need of care and treatment because of the parents' neglect or refusal to provide proper support and care necessary for the child's well-being.
Where the child's parents' whereabouts are not known, the child's custodian, if there is a custodian, is notified. Unless the court authorizes extended temporary protective custody, the child shall not be held for more than 24 hours. Sections 210.125, 210.130 and 211.031; Rule 111.12(d).
Section 210.125.3 provides that any person taking a child in protective custody shall "make a reasonable attempt to advise the parents, guardians or others legally responsible for the child's care." Section 210.130.2, which requires preparation of an oral report, provides, in pertinent part, that such report shall include the "names and addresses of the child and [her] parents or other persons responsible for [her] care, if known." Rule 111.12(e) provides that where the time for temporary protective custody has expired and the court has not authorized protective custody, "the juvenile shall be released to the juvenile's custodian or other suitable person."
Rule 115.01 provides, in pertinent part:
c. Service of summons shall be made personally upon the parents of the juvenile and upon the person having actual custody of the juvenile; provided that, if personal service cannot be had upon such persons, service of summons shall be made by registered or certified mail to their last known address.... The inability to service any party under this [rule] shall not deprive the court of jurisdiction to proceed.
Although Rule 115.01(c) requires service of summons to be served upon the parents of the child, inability to serve the parents does not deprive the court of its jurisdiction. The evidence clearly establishes that T.N.H. was found in St. Louis County in need of care and treatment, that her parents' whereabouts were unknown, and that T.N.H.'s custodians, the Taylors, were notified. At the time of the hearing, the evidence shows that Darrell's whereabouts were unknown and that he was involved with drugs and had been in drug rehabilitation. The evidence also shows that Mother's address was unknown. Under these circumstances, failure to serve summons upon the parents did not defeat the jurisdiction of the court.
To require the family and juvenile courts to delay placement of a child in protective custody until his or her parents are found and served with process in situations where the parents' whereabouts are not known would frustrate our State's obligation as "parens patriae" to protect the child physically present within its jurisdiction, as well as our State's policy of serving the best interest of the child. Piedimonte v. Nissen, 817 S.W.2d 260 (Mo.App.1991). Section 211.011.
In any event, Mother subjected herself to the jurisdiction of the court. Although Mother contends that the court did not have jurisdiction over her person due to a lack of service of process, she and her attorney appeared and participated in the February 17, 2000 hearing without questioning the court's jurisdiction over her person and her subsequent attorneys entered their appearances on her behalf, received permission to inspect the legal/social files, and subpoenaed and filed notices to take depositions. In none of these instances did Mother or her attorneys question the court's jurisdiction over her person. Such appearances cured any failure to serve process on Mother and she submitted *9 herself to the jurisdiction of the court. State v. Weinstein, 411 S.W.2d 267, 274 (Mo.App.1967).
In her second point, Mother contends that the court erred in failing to vacate or set aside the judgment because the petition failed to state a claim and failed to meet the requirements of Rule 114.01(b)(3) in that the petition alleged only that the whereabouts of Mother were unknown and said allegation was refuted by uncontroverted evidence.
There are no allegations in the protective custody petition against Mother specifically except that her address was unknown. However, since T.N.H. was found within the county in need of care and treatment and Darrell neglected to provide proper support and care necessary for T.N.H.'s well-being and this was sufficiently alleged and proven, it was not necessary to allege mother's failure to provide proper support and care under the circumstances. Section 211.031.1. This is not a termination of parental rights proceeding and an allegation that mother failed to provide proper support and care is not necessary where the child is found in need of care and treatment.
Mother further contends that a fraud has been perpetrated upon the court in that the DJO and DFS and GAL have all been involved in a conspiracy to deprive her of custody of T.N.H. The record clearly indicates that Mother has failed to establish the elements of fraud as to these individuals and DFS. Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo.banc 1988). Furthermore, the record reveals that Mother's conduct of the past ten years is not indicative of a parent dedicated to serving the best interest of her child and does not indicate any conspiracy to deprive Mother of her child. Therefore, her second point is not meritorious.
In her third point, Mother contends that the court erred in failing to grant her Motion to Rescind Orders pursuant to the ICPC because Section 210.610(sic) [210.620] Article VIII(a) renders the ICPC inapplicable to parents and mandates that ICPC does not have to be followed when a child is returned to his or her parents.
Interestingly, Mother sought in her August 18, 2000 Motion for Contempt to hold the State of Missouri and DFS in contempt for failure and refusal to refer the case to ICPC, but now wants to rescind the order referring the cause to ICPC. Further, on March 2, 2001, Mother acknowledged that an ICPC report had been completed and asked the court to compel the DJO to supplement the answers: "The Juvenile Officer is in receipt of psychological evaluations, DFS reports of parent/child visitation and the home study of the mother by the [S]tate of Virginia." Mother volunteered to participate in the ICPC and acknowledged that the report was completed, thereby accepting the court's decision in the matter.
Here, a final determination has not been made as to custody of T.N.H. and if, in its final determination, the court decides to return T.N.H. to Mother's residence in Virginia, DFS will be the agency sending her there, not Mother. Section 210.620 Article VIII. Thus, mother's contention is not meritorious.
Judgment affirmed.
JAMES R. DOWD, C.J., and CHARLES B. BLACKMAR, SR.J., concur.