**In the Matter of J.L.B., M.K.B. and M.L.B.**

**S.B. and J.B., Appellants,**

**v.**

**J.L., Respondent.**

**Nos. SD 28760, SD 28761, SD 28762.**

Missouri Court of Appeals, Southern District, Division One.

March 10, 2009.

Motion for Rehearing or Transfer Denied April 2, 2009.

Application for Transfer Denied May 5, 2009.

Karen L. Hobbs, Chandler, AZ, for Appellants.

J. Christopher Allen, Allen & Rector, Lebanon, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant S.B. ("Mother") and Appellant J.B. ("Father") (collectively "Appellants"), the natural parents of J.L.B., M.K.B., and M.L.B. (collectively "the children"), appeal the judgment of the probate court which had ceded jurisdiction pursuant to the provisions of the Uniform Child Custody Jurisdiction Act ("UCCJA"), section 452.450 *et seq.*, to the State of Utah in an ongoing guardianship matter in which guardianship of the children[1] had been previously granted to their maternal aunt, Respondent J.L. ("Guardian"). Appellants assert four points relied on.

In late September of 2002, J.L.B. alleged she had been sexually abused by Father. The Children's Division of the Department of Social Services ("the Children's Division") became involved with the family and began an investigation. At the conclusion of the investigation, the Children's Division found probable cause to believe that sexual abuse by Father had occurred and substantiated J.L.B.'s allegations. As a result of these findings and the determination by the Juvenile Office of Laclede County, Missouri ("the juvenile office") of "Mother's unwillingness to protect" her daughters, on November 25,

---

1. The record reveals J.L.B., a female child, was born on April 29, 1998; M.K.B., a female child, was born on July 12, 2000; and M.L.B., a male child, was born on October 5, 2003.

To protect the identities of the parties in this matter we shall refer to them by initials.
All statutory references are to RSMo 2000 unless otherwise stated.

2002, the Juvenile Office filed a petition for Order of Protection for J.L.B. and M.K.B. with the Juvenile Division of the Circuit Court of Laclede County ("the juvenile court").[2] Some time in November of 2002, J.L.B. and M.K.B. were placed by the juvenile court in the care of their maternal grandmother, J.C. ("Grandmother"). Thereafter, on December 17, 2002, a Full Order of Protection was entered against Appellants by the juvenile court and J.L.B. and M.K.B. continued in Grandmother's care.

On May 21, 2003, the juvenile court adjudicated Father "to have had inappropriate sexual contact with ..." J.L.B. Thereafter, as best we discern, on June 9, 2003, a representative from the Children's Division filed her report recommending guardianship for J.L.B. and M.K.B. On June 18, 2003, the docket sheet of the juvenile court reflected that an order was entered by the juvenile court placing physical custody of the children with Grandmother with "supervision by DFS *until the guardianship is complete.*" (Emphasis added.) The record also reveals that on this same date Guardian filed her "Petition for Appointment of Guardian of Minors" in the Probate Division of the Circuit Court of Laclede County ("the probate court") followed on August 4, 2003, by Grandmother's filing of her "Counter Petition for Appointment of Guardian of [Minors]."

The extensive hearing held in the probate court on the guardianship petitions on April 30, 2004, was attended by Grandmother and Guardian.[3] The probate court subsequently entered its "Judgment of Minor Guardianship" on May 10, 2004, as to J.L.B. and M.K.B. In its Judgment, the probate court set out Appellants "are unwilling, unable, unfit and have been adjudged unfit to assume the duties of guardianship ...," and observed that Father had "been specifically adjudicated as having sexually abused the minor child J.L.B." The probate court found Guardian was "ready and able to assume the duties of guardianship over [J.L.B.] and [M.K.B.] and it is in the best interests of the minor children for [Guardian] to assume the role of guardianship immediately." Further, in that Guardian was a resident of the State of Utah, the probate court permitted her to relocate the children to her home in Utah, subject to visitation periods with Grandmother. The probate court then issued "Letters of Guardianship" and physical and legal custody of J.L.B. and M.K.B. was transferred to Guardian.

While the juvenile cases and the probate cases were pending in relation to J.L.B. and M.K.B., Mother gave birth to M.L.B. in October of 2003. A juvenile case was never opened in relation to M.L.B.'s care. On May 4, 2004, Guardian filed a "Petition for Appointment of Guardian" as to M.L.B. with the probate court. Grandmother also filed a petition for guardianship of M.L.B. A hearing was held on December 10, 2004, and December 14, 2004, relating to these petitions. Mother and Father were in attendance but were not represented by counsel.[4] In its subsequent judgment, the probate court found Father "is unwilling, unable and unfit to assume the duties of guardianship" of M.L.B. and that Mother "while willing, is unable and unfit to assume the duties of the guardianship of

2. M.L.B. was not yet born when these proceedings were initiated.

3. In its judgment, the probate court noted that Appellants were "unrepresented and have failed to file any responsive pleading or participate in the trial of these causes."

4. The probate court noted in its judgment as to M.L.B. that "[n]either Mother nor Father have filed any responsive pleadings in this case nor is either represented by counsel. Both are allowed to present evidence and argument, *pro se.*" (Emphasis added.)

[M.L.B.]." The probate court then granted guardianship of M.L.B. to Guardian and issued Letters of Guardianship. The record reveals that M.L.B. was then permitted to join his siblings in Utah.

Throughout 2005 and 2006 various motions were filed by Grandmother, Guardian, and Appellants[5] relating to visitation and child support as well as a motion by Guardian to transfer jurisdiction of this matter to Utah where she resided.[6] A motions hearing was held on March 7, 2006, and the probate court took "the Motion to Transfer Cases to the State of Utah under advisement until such time as the [probate] [c]ourt has had an opportunity to speak with the Judge in Utah." The following day the probate court made the following docket entry:

> Court speaks with [Utah] Judge Rodney Page regarding jurisdiction. Judge Page advises Court that there are adoption proceedings pending in his Court and that the cases will proceed.
>
> Judge Rodney Page will keep this Court informed and will address jurisdictional issues with the Court as they arrive.
>
> Motion to transfer case to State of Utah is overruled at this time.

Thereafter, additional motions were filed regarding, among other things, attorney fees for the guardian *ad litem*, visitation issues, and enforcement of the UCCJA. On March 2, 2007, the probate court made the following docket entry:

> The Court is contacted, on 3/[1], by the Hon. Rodney Page Judge, of the 2nd District Court, Davis County, Utah as a follow up to the discussion previously

had on 3/8/06 regarding the adoption proceedings of the [children] pending before him in the State of Utah, and jurisdictional issues in this case.

> After discussing this case with Judge Page and reviewing the file, this Court finds the more appropriate forum for jurisdiction is in the State of Utah. Therefore, this Court cedes jurisdiction under the UCCJA to the State of Utah as to the minor child[ren].

In late March of 2007, Appellants filed the following motions: a "Motion for Rehearing and Retention of Jurisdiction;" a "Motion to Invite Comments of Missouri Doctors;" motions for visitation as to each child; a "Motion for Change of Guardian to a Missouri Resident;" and a "Motion to Retain Jurisdiction in Missouri." The probate court held a hearing on these motions on April 13, 2007, and, following argument by counsel, found:

> Missouri does have jurisdiction, the state of Utah has jurisdiction, and when you have those competing jurisdictions, there's a procedure that's laid out in the UCCJA to rectify that issue. And that's the process that Judge Page and I engaged in twice. . . .
>
> I have not heard anything that would alter my decision that was made in conference with Judge Page ceding jurisdiction to the state of Utah for them to proceed on the adoption proceedings.
>
> If that adoption proceeding should fail or otherwise be disposed of, this Court may assert jurisdiction at a later time. But right now, there's—and that would

---

**5.** Appellants appeared in these matters *pro se* from the filing of the petitions of guardianship until December 13, 2006, at which time they retained counsel.

**6.** We note the juvenile court entered an order on September 1, 2005, "dismissing cases [of

J.L.B. and M.K.B.] and relinquishing jurisdiction . . ." to the probate court.

Also, while not technically included in the record on appeal, both parties note in their briefs that at some point in time after returning to Utah with the children Guardian initiated adoption proceedings in that state.

be—the next step, I would say, would be for [Appellants] to try to file a motion to terminate the guardianship and that it's no longer needed. But right now, the issue that they're going to have to litigate is in the state of Utah. And it's my understanding that their interests were represented at the jurisdictional hearing in the state of Utah.

Accordingly, the probate court overruled Appellants' motion regarding jurisdiction and declined to "entertain other motions for lack of jurisdiction." This appeal followed.[7]

 This Court affirms a probate court's judgment in guardianship proceedings unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re Benson,* 124 S.W.3d 79, 83 (Mo.App.2004). As a result, we must affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We must consider the evidence and all reasonable inferences in a light most favorable to the probate court's judgment, disregarding any evidence or inferences to the contrary. *Id.* "Although we give deference to the [probate] court's factual determinations, our review of any error in applying the law is *de novo.*" *Pulley v. Sandgren,* 197 S.W.3d 162, 165 (Mo.App. 2006).

In their first point relied on, Appellants assert the probate court erred in establishing guardianships over the children because the probate court was without subject matter jurisdiction since the exclusive jurisdiction of the juvenile court over proceedings involving children alleged to be in need of care excludes courts of general jurisdiction from exercising jurisdiction over children who come within the provisions of the juvenile code, in that J.L.B. and M.K.B. came within the provisions of the juvenile code by the findings of the juvenile court, and M.L.B. had been brought within the provisions of the juvenile code and under the jurisdiction of the juvenile court by his situation; lacking subject matter jurisdiction the orders of the probate court are null and void.[8]

 "Subject matter jurisdiction, in contrast to personal jurisdiction, is not a matter of a state court's power over a person, but the court's authority to render a judgment in a particular category of case."[9] *J.C.W. and T.D.W., Minors, by their next friend, Kelly K. Webb v. Jason L. Wyciskalla,* 275 S.W.3d 249, 253 (Mo. banc 2009). "In contrast to the federal system, the subject matter jurisdiction of Missouri's courts is governed directly by the state's constitution." *Id.*

Article V, section 14 sets forth the subject matter jurisdiction of Missouri's circuit courts in plenary terms, providing that 'the circuit courts shall have original jurisdiction over *all* cases and matters, civil and criminal. Such courts may issue and determine original reme-

---

7. We note Appellants were granted permission by this Court to file a late notice of appeal in this matter.

8. *See State v. Weinstein,* 413 S.W.2d 178, 182 (Mo. banc 1967) (holding that juvenile courts are accorded "paramount jurisdiction over other courts in matters relating to the care and custody of children coming within the provisions of Chapter 211").

9. Typically issues relating to the "lack of subject matter jurisdiction can be raised at any stage in the proceedings." *Woods v. Mehlville Chrysler–Plymouth,* 198 S.W.3d 165, 169 (Mo. App.2006). "The only action a court without subject matter jurisdiction can take is to exercise its power to dismiss." *Id.*

dial writs and shall sit at times and places within the circuit as determined by the circuit court.'

*Id.* (quoting Missouri Constitution Article V, § 14). "Many types of cases may present issues where more than one court properly has subject matter jurisdiction over the same matter or issue. One of the most common is the area of child custody." *Kelly v. Kelly,* 245 S.W.3d 308, 312–13 (Mo.App.2008). " 'In Missouri, the custody of a child may be adjudicated in at least five types of actions: (1) dissolution; (2) habeas corpus; (3) juvenile; (4) guardianship; and (5) paternity.' " *Id.* (quoting *In Interest of Moreau,* 161 S.W.3d 402, 405–06 (Mo.App.2005)); *see also* section 211.051. In child custody matters, section 475.040 authorizes the probate court to appoint someone other than a parent as guardian in certain instances. " 'The probate division of the circuit court has the same legal and equitable powers to effectuate and to enforce its orders, judgments and decrees in probate matters as circuit judges have in other matters.' " *Kelly,* 245 S.W.3d at 313 (quoting § 472.030).

Here, Appellants try to collaterally attack the guardianship judgments entered in 2004 by incorrectly asserting the probate court lacked *subject matter jurisdiction* to enter its judgments. It is clear, however, from our reading of *J.C.W.* that cases such as *Weinstein,* 413 S.W.2d at 182, can no longer be read as countermanding the subject matter jurisdiction otherwise granted to the circuit court by Article V, section 14 of the Missouri Constitution to hear and decide civil cases. *J.C.W.,* 275 S.W.3d at 253–54. As set out in *Kelly,* 245 S.W.3d at 315, "[o]ur Supreme Court has recognized . . . that the term jurisdiction has been overused and misused to describe situations where it was *simply legally erroneous* to enter a conflicting judgment while another action was pending or a judgment involving the same issue still in effect."

In *Kelly,* the mother and the grandparents, the appellants therein, contended the trial court lacked subject matter jurisdiction to entertain a post-dissolution custody modification motion filed by the father of the child because there was an outstanding guardianship order placing custody of the child with the grandparents. *Id.* at 309. In support of their proposition that the trial court lacked subject matter jurisdiction, the appellants contended that under the " 'concurrent jurisdiction doctrine' the modification court was required to dismiss [the father's] motion to modify the dissolution order unless the guardianship had been previously terminated." *Id.* The reviewing court disagreed with the appellants and found that "the modification court *did* have [subject matter] jurisdiction, but f[ou]nd that the trial court *[legally] erred* in entering a conflicting custody order before termination of the guardianship." *Id.* It observed that "in some sense [it was] a misnomer to describe the concurrent jurisdiction doctrine as depriving one court of jurisdiction." *Kelly,* 245 S.W.3d at 313. Rather, the term was "simply a phrase describing the legal reality that more than one court had the legal authority to decide a matter." *Id.* Furthermore, the reviewing court noted that the term "concurrent jurisdiction" was "not an evaluative principle distinguishing between two potential decision-makers" and it noted other "rules determine how the conflict may be resolved." *Id.* at 314.

The *Kelly* court also quoted *In re the Marriage of Hendrix,* 183 S.W.3d 582, 590 (Mo. banc 2006), for the proposition that " [t]he tendency to call matters "jurisdictional" that are really only assertions of legal error greatly confuses the notion of jurisdiction in civil cases.' " *Kelly,* 245 S.W.3d at 315 (quoting *Hendrix,* 183

S.W.3d at 590). The *Kelly* court then observed that the trial court had but "legally erred in entering a judgment conflicting with the guardianship order before that order was terminated," and should otherwise "have taken steps to consolidate the two proceedings both for purposes of judicial efficiency and avoidance of inconsistent judgments." *Id.* at 315–16. Further, the appellate court found that the matters could be consolidated "before either the modification court or the probate division" and reversed and remanded for further proceedings. *Id.* at 316.

■ In the present matter, proceedings relating to the daughters were initiated in the juvenile court. As best we discern from the record, the juvenile court expressly recognized it was aware of the guardianship proceedings pending in the probate court; the probate court entered its judgments of guardianships; and the juvenile court, thereafter, dismissed its proceedings. As in *Kelly*, what in reality Appellants are asserting are errors of law and not issues of subject matter jurisdiction; accordingly, their allegation of legal error should have been timely brought via appeal following the entry of the judgments of guardianship in this matter on May 10, 2004, and December 14, 2004. *See* Rule 81.04.[10] Appellants cannot now attempt to bootstrap such an attack by arguing a lack of subject matter jurisdiction. Point I is denied.

■ In their second point relied on, set out as an alternative to Point I, Appellants assert the probate court erred in establishing guardianships over the children "be-cause parents have a fundamental liberty interest in their children and restrictions upon parental rights must be in accordance with due process of law which includes the right to notice, the right to be heard, and, in matters where parent-child bonds are at risk, the right to counsel. . . ." Specifically, Appellants assert they are aggrieved because their "parental rights have been restricted through guardianships which severely limit parents' contact and visitation with their children, and which will likely have a destructive effect on parent-child bonds . . .;" Appellants "were denied notice of the temporary guardianship hearing for their son . . .;" Appellants "were denied the right to be heard and to defend in the guardianship trial involving their daughters . . .;" and Appellants "were denied counsel throughout the probate proceedings." As such, Appellants urge they "have been denied due process in defending their fundamental liberty in their children, making the orders of the probate court void for want of due process of law."

Here, the Letters of Guardianship and Judgments of Guardianship of J.L.B. and M.K.B. were entered on May 10, 2004. The Letters of Guardianship and Judgment of Guardianship as to M.L.B. was entered on December 14, 2004. Appellants did not appeal those rulings at that time nor did they challenge them substantively in the four years this matter was pending in the probate court.[11] All of the issues raised in this point relied on were reviewable, if at all, at the time the guardianship judgments were entered in 2004. Appellants cannot now challenge these is-

10. All rule references are to Missouri Court Rules (2008).

11. We note that section 211.462.2 relating to the juvenile court provides that in termination of parental rights proceedings the "parent or guardian of the person of the child shall be notified of the right to have counsel, and if they request counsel and are financially unable to employ counsel, counsel shall be appointed by the court. . . ." We find no similar provision in the probate code relating to guardianship proceedings.

sues in that their time to appeal them expired in excess of four years ago. *See* Rule 81.04.[12] Appellants' arguments under this point relied on are not cognizable in this appeal. *Id.* Point II is denied.

As an alternative to both Points I and II, Appellants' third point relied on asserts the probate court erred "in transferring jurisdiction over [the children] to Utah, because the [Interstate Compact on the Placement of Children ("ICPC")] requires that when a child is sent or brought into a state for interstate placement, the sending agency that caused the child to be sent or brought into the receiving state must retain jurisdiction...." Appellants urge "the probate court lacks authority to transfer jurisdiction" in the present situation because "the children were brought in the State of Utah for interstate placement ...;" "the probate court is the sending agency that caused M.L.B. to be brought into the State of Utah ...;" and "the juvenile court is the sending agency that caused J.L.B. and M.K.B. to be brought into the State of Utah." [13]

Having searched the voluminous record in this matter, this Court has failed to find a single instance in the transcripts or in the legal file where Appellants raise this issue.[14] "A party on appeal generally

'must stand or fall' by the theory on which he tried and submitted his case in the court below." *Kleim v. Sansone,* 248 S.W.3d 599, 602 (Mo. banc 2008) (quoting *Walker v. Owen,* 79 Mo. 563, 568 (Mo. 1883)).

With that being said, despite their failure to raise this claim below, this Court "may, at its discretion, review [their] claim for plain error" under Rule 84.13(c). *In re R.S.L.,* 241 S.W.3d 346, 351 (Mo.App.2007). We do so because these proceedings involve the custody of children.

In determining whether to exercise its discretion to provide plain error review, the appellate court determines whether there facially appears substantial grounds for believing that the probate court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice. *Care and Treatment of Heikes v. State,* 170 S.W.3d 482, 485 (Mo.App.2005). "If a claim of plain error does not facially establish substantial grounds for believing manifest injustice or miscarriage of justice has occurred, an appellate court should decline to review for plain error." *Id.*

Turning to the substance of Appellants' asserted point relied on, Appel-

---

**12.** Section 472.180 sets out that in probate matters "[a]ll appeals shall be taken within the time prescribed by the rules of civil procedure relating to appeals." Accordingly, Rule 81.04 is applicable to the present matter.

**13.** We note Appellants appeal from the probate court's docket sheet entry of March 2, 2007, which ceded jurisdiction of this guardianship matter to Utah. Although this "judgment" is not denominated as such and is not a signed writing by the court as required by 74.01(a), it is nevertheless a final judgment for purposes of appeal in that Rule 74.01(a) has been consistently held not to apply in probate proceedings. *Kemp v. Balboa,* 959 S.W.2d 116, 118 (Mo.App.1997); *In re Estate of Standley,* 204 S.W.3d 745, 749 (Mo.App.

2006). Section 472.160.1(14) authorizes an appeal in the probate division "in all other cases where there is a final order or judgment of the probate division of the circuit court under this code except orders admitting to or rejecting wills from probate." *See In re Nelson,* 119 S.W.3d 197, 201 (Mo.App.2003). Accordingly, we have the authority to address this appeal.

**14.** The issue was mentioned in the testimony of a Children's Division caseworker at the guardianship hearing for M.L.B. on December 10, 2004, and was otherwise brought up during arguments by counsel for other parties.

lants urge the ICPC is applicable in the present matter and that its provisions were breached by the probate court due to its ruling that it was ceding jurisdiction of this guardianship matter to the State of Utah.

 The ICPC is embodied in section 210.620. The purpose of the ICPC is for states "to cooperate with each other in the interstate placement of children . . ." such that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." Article V of section 210.620, regarding jurisdiction, states:

(a) The sending agency [15] shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement. Nothing contained herein shall defeat a claim of jurisdiction by a receiving state sufficient to deal with an act of delinquency or crime committed therein.

(b) When the sending agency is a public agency, it may enter into an agreement with an authorized public or private agency in the receiving state providing for the performance of one or more services in respect of such case by the latter as agent for the sending agency.

(c) Nothing in this compact shall be construed to prevent a private charitable agency authorized to place children in the receiving state from performing services or acting as agent in that state for a private charitable agency of the sending state; nor to prevent the agency in the receiving state from discharging financial responsibility for the support and maintenance of a child who has been placed on behalf of the sending agency without relieving the responsibility set forth in paragraph (a) hereof.

Article VIII of the ICPC specifically states it "shall *not* apply to: (a) [t]he sending or bringing of a child into a receiving state by his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state." § 210.620 (emphasis added).

The application of the ICPC has only been addressed in three reported Missouri cases: *In re Adoption of Baby Boy W.,* 701

---

15. Article II of section 210.620 sets out that a "sending agency" is "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state;" that a "receiving state" is "the state to which a child is sent, brought, or caused to be sent or brought, whether by public authorities or private persons or agencies, and whether for placement with state or local public authorities or for placement with private agencies or persons;" and that "placement" is "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility."

S.W.2d 534 (Mo.App.1985), an adoption proceeding initiated in Missouri where the adoptive parents resided in Indiana and the child and its biological parents resided in Missouri; *In re Baby Girl*, 850 S.W.2d 64 (Mo. banc 1993), an adoption proceeding in which Arkansas residents filed a petition for adoption in Missouri to adopt a Missouri baby from a couple living in Missouri; and *In re T.N.H.*, 70 S.W.3d 2, (Mo.App.2002), upon which Appellants exclusively rely.

Article VIII of section 210.620 specifically states its provisions do not apply to the "sending or bringing of a child into a receiving state by ... his guardian...." Nevertheless, Appellants maintain *In re T.N.H.* supports their position that "the status of the interstate caregiver as relative or guardian does not negate the applicability of the ICPC" because "[t]he court is the entity whose authority caused the children 'to be sent or brought' in the state of Utah." Appellants argue that it was the Laclede County Circuit Court through its juvenile and probate divisions which caused the children to be sent or brought to Utah. We disagree.

In *In re T.N.H.*, mother was residing in Virginia Beach, Virginia, when, in August of 1989, she became pregnant by father, who was stationed in the Navy. *Id.* at 4. In May of 1990, while the child was in father and step-mother's custody, father and step-mother moved from Virginia to Texas with the child. *Id.* Mother made contact with them in Texas and told them to keep the child with them in Texas. *Id.* In July of that year mother filed a petition seeking custody of the child in juvenile court in Virginia; however, she made no progress on this petition in that the summons was sent to father's old address. *Id.* In March of 1991, father, step-mother, and the child moved to Missouri and were able to get into contact with mother by telephone on

several occasions; however, in time, Mother ceased her phone conversations with the child. *In re T.N.H.*, 70 S.W.3d at 5. In November 4, 1996, father and step-mother divorced and the child lived with step-mother until June of 1998 when she began living with her paternal grandmother. *Id.* Thereafter, the child was taken into protective custody by the Children's Division and on July 6, 1998, a protective custody petition was filed against father for failing to care for the child and leaving her in grandmother's custody because grandmother "was not at the time entitled to legal or physical custody of ..." the child. *Id.* In the petition, Mother's address was listed as "whereabouts ... unknown" and she did not appear at the subsequent hearing on the petition. *Id.* Following the hearing, legal custody of the child was placed with the Children's Division and physical custody of the child was granted to grandmother and grandfather. *Id.* at 5–6.

Mother eventually received notice of the proceedings, appeared at a hearing on February 17, 2000, and then filed several motions with the juvenile court. *In re T.N.H.*, 70 S.W.3d at 6. The juvenile court continued the previous custody orders in place. *Id.* Following an August 8, 2000, hearing the juvenile court entered several orders including "an order to [the Children's Division] to immediately refer the case 'to ICPC'" and the matter was continued to "further consider [m]other's motions, protective custody, and [grandparents'] petition for guardianship." *Id.* at 7. On August 18, 2000, mother filed a motion for contempt "against the State of Missouri and [the Children's Division] alleging that [the Children's Division] and State of Missouri willfully failed and refused to refer the case to ICPC and arrange visitation." *Id.* The "motion was denied on September 5, 2000." *Id.* Then, on November 22, 2000, mother reversed her point-of-

view and filed a "Motion to Rescind previous orders requiring referral by [the Children's Division] to ICPC ...," which was later denied by the juvenile court. *In re T.N.H.*, 70 S.W.3d at 6. Mother then appealed. *Id.*

On appeal, mother argued the juvenile "court erred in failing to grant her Motion to Rescind Orders pursuant to the ICPC because [section 210.620] Article VIII(a) renders the ICPC inapplicable to parents and mandates that ICPC does not have to be followed when a child is returned to his or her parents." *Id.* at 9. In addressing this point, the appellate court stated:

Interestingly, [m]other sought in her August 18, 2000[,] Motion for Contempt to hold the State of Missouri and [the Children's Division] in contempt for failure and refusal to refer the case to ICPC, but now wants to rescind the order referring the cause to ICPC. Further, on March 2, 2001, [m]other acknowledged that an ICPC report had been completed.... Mother *volunteered to participate in the ICPC* and acknowledged that the report was completed, thereby accepting the court's decision in the matter.

Here, a final determination has not been made as to custody of [the child] and if, in its final determination, the court decides to return [the child] to [m]other's residence in Virginia, [the Children's Division] will be the agency sending her there, not [m]other.

*In re T.N.H.*, 70 S.W.3d at 9 (emphasis added). Accordingly, the appellate court denied mother's appeal. *Id.*

The facts of the present, consolidated cases, are not similar to those found in *T.N.H.* In *T.N.H.*, mother did not have custody of the child. *Id.* at 5–6. Furthermore, as the court noted in its opinion, mother "volunteered to participate in the ICPC and acknowledged that the report was completed, thereby accepting the court's decision in the matter." *Id.* at 9. In the present matter, as legally appointed guardian of the children, Guardian relocated the children to Utah. The record reveals and Appellants concede in their brief that consent for the Guardian to relocate to Utah with the three children was approved by the probate court as to all the children as well as by the juvenile court as to J.L.B. and M.K.B.[16] As previously related, Article VIII of section 210.620 clearly sets out that the ICPC does not apply to the "sending or bringing of a child into a receiving state by ... his guardian."

The present matter is, however, akin to that found in the case of *In re Interest of Eric O.*, 9 Neb.App. 676, 617 N.W.2d 824 (2000). In *In re Interest of Eric O.*, in June of 1997 the juvenile court, over the objection of father, appointed "Cole C. and Patricia C." as guardians for two children, who had been in their care since 1994. *Id.* at 827–28. In 1999, Cole and Patricia filed a motion to move with the children to Texas and father, who had been exercising visitation rights with the children, filed a motion objecting to the relocation. *Id.* at 828–29. The juvenile court denied father's motion and allowed the children to move to Texas with Cole and Patricia. *Id.* at 829.

On appeal, the appellate court noted that both "Nebraska and Texas have adopted the [ICPC]" and "[a]bsent an exclusion, the [ICPC] would be applicable to the movement of [the children] from Nebraska to Texas." *Id.* at 830. It stated the ICPC's "purpose is to ensure that states cooperate with each other 'in the

**16.** The probate court had ordered the Children's Division to obtain an ICPC report relating to Guardian through the State of Utah on February 19, 2004, and a Utah home study was ordered by the Children's Division in April of 2004.

interstate placement of children,'" *In re Interest of Eric O.*, 617 N.W.2d at 830 (quoting Neb.Rev.Stat. § 43–1101), and that

> Article VIII of the [ICPC] provides that [it] does not apply to '[t]he sending or bringing of a child into a receiving state by his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state.' This exception is applicable in the present case, because as we earlier said, the record shows that at the time of the removal application, [Cole and Patricia] were court-appointed guardians of the boys.
>
> Therefore, because the record shows that Cole and Patricia are guardians, we hold that compliance with the [ICPC] was not a prerequisite to [the children's] moving to Texas.

*Id.* (quoting Neb.Rev.Stat. § 43–1101).

Here, Guardian had a court order from the probate court appointing her as the children's guardian and she had specifically been granted permission to relocate to Utah with the children. The ICPC is not applicable in this instance. We find no plain error. Point III is denied.

■ Lastly, as another alternative to Points I and II, Appellants maintain in their fourth point relied on that the probate court erred in transferring jurisdiction of the children to Utah "because due process requires that jurisdiction must not 'offend traditional notions of fair play and substantial justice'...." Appellants argue this transfer of jurisdiction was in derogation of their constitutional due process rights in that they "have no contacts with the State of Utah ...;" they "lack means to defend their parental rights in the State of Utah because any grounds that exist for termination of parental rights are based

upon actions that occurred in the State of Missouri and all witnesses for [Appellants] are located within the State of Missouri ...;" and they "lack financial means to travel to attend court proceedings in the State of Utah."

■ As in Point II above, Appellants maintain here that their due process rights were violated. This issue was not raised prior to this time and such constitutional assertions must be raised "'at the first available opportunity'" and preserved "'throughout the proceedings.'" *In re J.M.N.*, 134 S.W.3d 58, 73 (Mo.App.2004) (quoting *In the Interest of T.E.*, 35 S.W.3d 497, 504 (Mo.App.2001)). Appellants' due process arguments are not preserved for appeal. *Id.* Point IV is denied.

The judgment of the probate court is affirmed.

BATES, J., and SCOTT, P.J., concur.