In the Interest of K.L.W., Respondent,

L.M.M., Appellant,

v.

D.R.P., Respondent,

N.B., Defendant.

No. WD 62794.

Missouri Court of Appeals,
Western District.

April 9, 2004.

Marilyn M. Shapiro, Kansas City, MO, for appellant.

Anastacia R. Adamson, Guardian, Nancy Stuver Wallingford, Kansas City, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, PAUL M. SPINDEN, Judge and EDWIN H. SMITH, Judge.

JOSEPH M. ELLIS, Chief Judge.

Appellant Lisa Meade appeals from a judgment entered in the Circuit Court of Jackson County dismissing her petition for the adoption of three-year-old K.L.W. and ordering K.L.W. placed in the temporary care and custody of Respondent Dorothy Patterson for subsequent adoption. For the following reasons, we reverse the judgment and remand the cause for an evidentiary hearing before a different judge.

K.L.W. was born on July 2, 2000. K.L.W.'s mother was Tiffany Renece Williams, and her putative father was Jeffrey Millner. At the time of her birth, K.L.W. had three half-brothers (T.W., born February 27, 1997; M.W., born May 17, 1998; and A.S., born June 19, 1999), all of whom were in the custody of her great-grandmother Norma Brown.

Upon her birth, K.L.W. was placed in the custody of the Division of Family Services ("DFS"). On July 4, 2000, DFS placed K.L.W. in the foster care of Respondent. At that time, Respondent's biological daughter, her three adopted children, and three foster children were already living with Respondent.[1]

On November 9, 2001, all parental rights to K.L.W. were terminated. That same day, all parental rights to A.S. were also terminated, and A.S. was removed from the custody of his great-grandmother.

Because the family court commissioner handling the cases had expressed a preference that K.L.W. and A.S. be adopted as a sibling group, DFS began recruitment for an adoptive family that would accept both children. During the DFS recruitment efforts, Respondent informed DFS that she would be interested in adopting K.L.W., but that she would not be interested in adopting A.S.

At an adoption staffing meeting on February 19, 2002, Appellant was chosen as the adoptive placement for K.L.W. and A.S.[2] During that meeting, Respondent supported the placement of K.L.W. with Appellant. On February 28, 2002, Appellant filed petitions to adopt K.L.W. and A.S.

About that time, K.L.W.'s mother had another child, T.M., K.L.W.'s full sister, who was taken into DFS custody and was placed with Appellant. Appellant subsequently filed a petition to adopt T.M.

Starting in March 2002, DFS began conducting pre-placement visits between Appellant and K.L.W. at K.L.W.'s daycare center. Shortly after these visits began, Respondent filed a grievance with DFS, claiming that she had heard that DFS was

---

1. In placing K.L.W. with Respondent, DFS apparently chose to disregard the provisions of 13 CSR 40–60.020, enacted in 1978 and last amended in 1983, which provides:
 (1) The maximum number of children in a foster home shall not exceed six (6) including the foster parents' children, counting child as any individual under age eighteen (18), with the following exceptions:
 (A) Foster children sibling groups; and
 (B) Minor mother and child family groups.
 (2) Foster parent(s) shall not provide care for more than two (2) children under age two (2) and no more than four (4) preschool age children unless necessary to accommodate a sibling group.
 (3) Any foster home exceeding the regulated total numbers at the time these regulations are adopted shall continue to qualify for license if all other requirements are met. Additional foster children shall not be placed in these homes until such time as they can comply to this rule.

2. At an adoption staffing meeting on January 28, 2002, A.S. was represented by three individuals from CASA, which was serving as his guardian ad litem. K.L.W. was represented by an individual from the Office of the Guardian Ad Litem. At that meeting, Appellant and Melissa Mosher, both of whom had agreed to adopt both K.L.W. and A.S., were considered as adoptive placements for the children. In a close vote of those present, Mosher was chosen as the adoptive placement for the children.

 After concerns arose that A.S.'s guardian ad litem was afforded three votes at the staffing meeting while K.L.W.'s guardian was only allowed one vote, another adoptive staffing meeting was conducted on February 19, 2002. At that meeting, Appellant was chosen as the adoptive placement for K.L.W. and A.S. Respondent supported the placement of K.L.W. with Appellant during that meeting.

going to move K.L.W. sooner than she thought it should and that Appellant and the DFS worker were rude to the people at K.L.W.'s daycare center.

Late in the evening on April 2, 2002, K.L.W. was placed in Appellant's home. On April 4, 2002, Respondent called Appellant's home to speak to K.L.W. After that phone call, K.L.W. was upset. When Respondent called to speak with K.L.W. again the following day, Appellant told her that the phone calls would have to stop for a while until she had some time to bond with K.L.W. On April 5, 2002, Respondent sent a letter to the commissioner to complain about her inability to communicate with K.L.W. A handwritten note on top of the letter bearing the commissioner's initials and dated April 8, 2002, stated, "Copy to parties then to social and adoption file." After no action was taken on her letter to the commissioner and subsequent phone calls to numerous DFS workers, Respondent called the child abuse hotline on April 15, 2002, to report that Appellant was emotionally abusing K.L.W. by not allowing phone calls and visits with Respondent.

After Respondent made several more calls to the DFS office in Jefferson City, a mediation session was set up between Appellant and Respondent. At that mediation, it was decided that Respondent and her family would be allowed to have some supervised visitation with K.L.W. Those visits were supervised by Judith Anderson, a psychologist. Eventually, when Anderson determined that the visits were no longer beneficial to K.L.W., she terminated the visitation.

On May 8 and May 28, 2002, Respondent sent letters to the commissioner expressing concerns about K.L.W.'s placement with Appellant. Handwritten notes

on the top of these letters bearing the commissioner's initials stated that copies of the letters were to be sent to the parties and the original was to be placed in the legal file.

On June 11, 2002, DFS placed Respondent's foster care license on suspension effective June 6, 2002. On June 24, 2002, Respondent wrote a letter to the commissioner expressing her concerns about her suspension and DFS's handling of K.L.W.'s placement. Respondent also complained about the fact that she had not been receiving notice of hearings or DFS reports in the case and asked the commissioner if notices could be sent to her advising her of upcoming hearings and reviews in the case. A handwritten note on the top of Respondent's letter, dated June 26, 2002, and bearing the commissioner's initials, ordered the letter placed in the legal file, copies of the letter sent to all parties, and Respondent added to the "copy list" in the case.

Subsequently, on June 28, 2002, K.L.W.'s guardian ad litem filed a motion for change of judge for cause. The guardian ad litem's motion for change of judge was denied by the commissioner on July 10, 2002, apparently without an evidentiary hearing.

Later that month, it was determined that A.S. and K.L.W. could be adopted separately, and A.S. was adopted by Melissa Mosher instead of Appellant. About that time, Appellant's adoption of T.M. was finalized.[3]

About a week before Appellant's petition to adopt K.L.W. was to be heard, Respondent filed a petition for the adoption of K.L.W. The petitions were heard by the family court commissioner on October 31,

---

**3.** When Appellant's adoption of T.M. was finalized, the court also granted Appellant's request to change the name of the child. In the interests of clarity, however, this court will continue to refer to this child as T.M. throughout this opinion.

November 1, November 7, and December 18, 2002.

On February 18, 2003, the commissioner entered his Findings and Recommendations. The commissioner dismissed Appellant's petition and found that it was in K.L.W.'s best interests to be placed in the temporary care and custody of Respondent for subsequent adoption. The circuit court accepted the commissioner's Findings and Recommendations and adopted them as its judgment later that day.

■ On appeal, Appellant argues that the commissioner improperly denied the motion for change of judge. That motion noted that the commissioner had received four ex parte letters from Respondent and averred that the commissioner had written instructions on the top of each of those letters. The motion asserted that, after having received a letter from Respondent on June 26, 2002, in which Respondent asked to be provided with notice of hearings in the case, the commissioner ordered that Respondent be placed on the "copy list." The motion noted that Ms. Patterson was not a party to the current case and did not have a legitimate interest in the case as a former foster parent and asserted that the court had violated various statutes and court rules by adding her to the copy list. In addition, the motion made the following assertion:

> On June 10, 2002, a review hearing was held in the case of [A.S.]. DFS objected to Ms. Patterson being allowed in the courtroom because she was not a party to the case nor the foster parent for the child. [The commissioner] allowed Ms. Patterson to remain in the courtroom. After the parties and attorneys had left the courtroom, Ms. Patterson returned to the courtroom and spoke to [the commissioner] at the bench. It is unknown what conversation took place at that time, however, upon exiting the court-room Ms. Patterson was seen "high-fiving" several individuals.

The motion asserted that the foregoing ex parte communications between Respondent and the court were improper under the Code of Judicial Conduct and that the commissioner's actions, at the very least, created an appearance of impropriety requiring the disqualification of the commissioner. Appellant argues on appeal that the commissioner improperly denied that motion.

■ "A denial of a motion for change of judge is reviewed for an abuse of discretion." *McPherson v. U.S. Physicians Mut. Risk Retention Group,* 99 S.W.3d 462, 486 (Mo.App. W.D.2003). "An abuse of discretion is committed if the trial court's decision defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration." *Betts–Lucas v. Hartmann,* 87 S.W.3d 310, 328 (Mo.App. W.D. 2002). "Our review must be based on the objective facts of the record from the standard point of a reasonable and disinterested bystander, unacquainted with the personality, the integrity and dedication of the judge." *State ex rel. McCulloch v. Drumm,* 984 S.W.2d 555, 557 (Mo.App. E.D.1999).

■ Family court commissioners are obligated to conduct themselves as judicial officers and to follow established procedural and substantive law. *State ex rel. Kramer v. Walker,* 926 S.W.2d 72, 76 (Mo. App. W.D.1996). "Rule 2, Supreme Court Rules, codifies the standard for judicial conduct," and "Rule 2 and the canon[s] of ethics are as applicable to [c]ommissioners as they are to any other judicial officer." *Id.*

■ "Rule 2, Canon 3 D(1) provides that the judge has a duty to recuse 'in a

proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to' the instances delineated." *Williams v. Reed,* 6 S.W.3d 916, 921 (Mo.App. W.D.1999). " '[A] judge's duty to disqualify is not confined to the factors listed . . . but is much broader.' " *McPherson,* 99 S.W.3d at 488 (quoting *State ex rel. Wesolich v. Goeke,* 794 S.W.2d 692, 698 (Mo.App. E.D.1990)). "Under Canon 3(D), the test is not whether actual bias or prejudice exist, but whether a reasonable person would have factual grounds to doubt the impartiality of the judge." *Drumm,* 984 S.W.2d at 557. "Judges must 'err on the side of caution by favoring recusal to remove any reasonable doubt [of] impartiality.' " *McPherson,* 99 S.W.3d at 491 (quoting *Robin Farms, Inc. v. Bartholome,* 989 S.W.2d 238, 247 (Mo.App. W.D.1999)).

 "The public's confidence in the judicial system is the paramount interest safeguarded by the canon." *Id.* at 488. " 'It is vital to public confidence in the legal system that decisions of the court are not only fair, but also appear fair.' " *State ex rel. Thexton v. Killebrew,* 25 S.W.3d 167, 171 (Mo.App. S.D.2000) (quoting *Goeke,* 794 S.W.2d at 695). " 'Acts or conduct [that] give the appearance of partiality should be avoided with the same degree of zeal as acts or conduct [that] inexorably bespeak partiality.' " *McPherson,* 99 S.W.3d at 489 (quoting *State v. Garner,* 760 S.W.2d 893, 906 (Mo.App. S.D.1988)).

 "Because litigants who present their disputes to a Missouri court are entitled to a trial which is not only fair and impartial, but which also appears fair and impartial, the test for recusal is not whether the court is actually biased or prejudiced." *Williams,* 6 S.W.3d at 921–22. "Rather, the test for recusal when the judge's impartiality is challenged is 'whether a reasonable person would have a factual basis to find an appearance of impropriety and thereby doubt the impartiality of the court.' " *Id.* at 922 (quoting *State v. Jones,* 979 S.W.2d 171, 178 (Mo. banc 1998) (quoting *State v. Smulls,* 935 S.W.2d 9, 17 (Mo. banc 1996))). "If the record demonstrates that a reasonable person would find an appearance of impropriety, recusal is compulsory." *Drumm,* 984 S.W.2d at 557.

In denying the motion for change of judge, without an evidentiary hearing, the commissioner made the following findings:

1. This Court, following it's long-standing custom and practice, forwarded the "un-solicited" correspondence to the parties and the child's legal file without having read any of the material therein contained. Of the Court's staff, the Judicial Administrative Assistant alone reviewed the material received, and that solely for the purpose of asscertaining [sic] the identity of the subject child (ren) in order to appropriately distribute those materials.

2. The Court has not acted on any matter referenced in said materials, nor is it the intent of the Court so to act save to the extent that any relevant evidence therein is properly presented at trial.

3. As respects the scheduled Review in cause numbered JV00–01002 [K.L.W.'s case], the Court has exercised jurisdiction herein since its filing on July 3, 2000; adjudicated the underlying allegations in January 19, 2001; and there is not non [sic] pending any issues that remain to be adjudicated.

4. The Court categorically denies all remaining assertions of the Movant, save the fact that Dorothy Patterson was permitted to remain in the

Courtroom over the request for her removal by the Guardian ad litem. In making these findings, the commissioner appears to have focused entirely upon the issues of whether his actions were actually improper and whether he demonstrated bias against any of the parties.

■ "The question, though, is whether the [commissioner]'s impartiality *might* reasonably be questioned, not whether the [commissioner] was, in fact, biased." *McPherson*, 99 S.W.3d at 490 (emphasis in original). " '[I]t is irrelevant in determining whether there is an appearance of impropriety, whether the trial judge was actually biased or prejudiced against a party.' " *Id.* at 489 (quoting *Robin Farms*, 989 S.W.2d at 248).

The commissioner's findings wholly fail to address the issue of the appearance of impropriety arising under the facts and circumstances present in this case. The commissioner made no finding regarding whether he had written the notes on top of the various letters or whether these notes created an appearance of impropriety. Having reviewed the record in the case, we find that, if these notes were found to have been written by the commissioner, a reasonable person would have a factual basis to find an appearance of impropriety on the part of the commissioner and to therefore doubt the impartiality of the court. *Williams*, 6 S.W.3d at 921.

Regardless of whether the commissioner actually read and/or acted upon any of Respondent's letters, if the hand-written comments upon Respondent's June 24 letter was written by the commissioner or placed there at his instruction, those comments clearly give the appearance that the commissioner had read the letter and was adding Respondent to the "copy list" in response to her request that she receive notice of future hearings in the case. Rule 2.03, Canon 3(B)(7) provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding...." [4] From those notes, a reasonable person would have a factual basis for believing that the commissioner had violated this canon by reading and acting upon the letter's contents.

Furthermore, a reasonable person could find the appearance of impropriety in the commissioner's sua sponte *addition* of Respondent to the "copy list" without any formal motion before the court or any chance for the parties to voice opposition to Respondent's inclusion on that list. Respondent was not a party to the action and was not K.L.W.'s current custodian.

Moreover, based upon the actions taken in response to the June 24 letter, an objective, reasonable person could reasonably infer from the hand-written notes on Respondent's other letters that the commissioner had at least read and considered them.

The cumulative effect of the ex parte communications between respondent and the commissioner and the hand-written notes on Respondent's letters, if found to have been placed there by the commissioner, would cause a reasonable layman to question the propriety of these communications and the commissioner's actions and to conclude that there was at least an appearance of impropriety. As noted *supra*, where "the record demonstrates that a reasonable person would find an appearance of impropriety, recusal is compulso-

4. The rule sets out several exceptions to this rule, none of which are applicable to the case at bar.

ry." *Drumm*, 984 S.W.2d at 557. Thus, if the commissioner wrote the notations on top of Respondent's letters or if those notations were placed there at his instruction, the commissioner was required to recuse.

The trial court's judgment is reversed, and the cause is remanded to the presiding circuit judge to assign a judge, according to local court rules, to conduct an evidentiary hearing to determine whether the motion for change of judge should have been granted. If it is determined that the commissioner should have recused himself, a new hearing on the merits should be granted. If the hearing court finds no basis for disqualification of the commissioner, then the cause may be reassigned to the commissioner for re-entry of his judgment.

All concur.