MISSOURI DEPARTMENT OF SOCIAL SERVICES, CHILDREN'S DIVISION, Respondent,

v.

B.T.W. (Father), Appellant.

No. WD 76323.

Missouri Court of Appeals, Western District.

Nov. 26, 2013.

Application to Transfer to Supreme Court Denied Dec. 24, 2013.

Application for Transfer Denied Feb. 4, 2014.

Joel Dake, Andrew Webb, Sedalia, MO, for Appellant.

Gary Gardner, Jefferson City, MO, for Respondent.

Before Division Four: JAMES EDWARD WELSH, C.J., CYNTHIA L. MARTIN, J., and JAMES THOMPSON, SP. J.

JAMES EDWARD WELSH, Chief Judge.

B.T.W. (Father) appeals the circuit court's judgment terminating his parental rights to his daughter, T.A.W. (Child). He contends that the Missouri court lacked jurisdiction to determine Child's custody under the Uniform Child Custody Jurisdiction Act (UCCJA),[1] that he was denied due process, and that the judge who presided over the case was biased against him and failed to follow the statutory dictates. He also contends that the court's findings of abandonment, neglect, and failure to rectify harmful conditions were not supported by the evidence and that the court erred in finding that termination was in Child's best interest. We affirm.

---

1. The UCCJA, sections 452.440 to 452.550, was in effect when the juvenile petition was filed. It was repealed by L. 2009 H.B. 481 § A and replaced by the Uniform Child Custo-dy Jurisdiction and Enforcement Act (UC-CJEA), sections 452.700 to 452.930, effective August 28, 2009. *See Hightower v. Myers*, 304 S.W.3d 727, 732 n. 4 (Mo. banc 2010).

## Background

We view the evidence in the light most favorable to the circuit court's ruling. *In re A.M.S.*, 272 S.W.3d 305, 307 (Mo.App. 2008). The evidence reveals that Child was born on November 23, 2002, in Chicago, Illinois. The child's natural mother (Mother) and Father were not married when Child was born, but Father is identified as Child's father on her birth certificate, and he admits that he is her father. Father has resided in Illinois throughout the pendency of this case. Mother and Child lived in Illinois until October 2006, when Mother and a family friend ("Aunt")[2] brought Child and two of Mother's other children to Pettis County, Missouri, to live.[3]

Mother gave birth to her fifth child soon after arriving in Missouri. Shortly thereafter, the Missouri Department of Family Services, Children's Division, became involved based on concerns about Mother's ability to properly care for the baby. The Division provided intensive in-home services to the family. The service providers observed that Mother failed to give the children such basic care as feeding, bathing, dressing, or changing diapers. The providers also reported that Mother repeatedly spanked her two-month-old baby for crying and that she had pointed a toy gun to each of the children's heads and said, "Pow-you're dead."

On December 27, 2006, the in-home services provider notified the Division that she believed that the children "are at imminent risk," and she requested "immediate intervention." The Division held a family support team meeting the next day, and Mother admitted that she could not care for the children and said that she wanted Aunt to take them. The Children's Division petitioned for removal of the children based on an "emergency situation," and the circuit court issued a protective custody order.

On December 29, the juvenile office filed a "Neglect & Abuse" petition pursuant to section 211.031, RSMo Cum.Supp.2006 (herein referred to as the "juvenile case" or "neglect case"). Father was not named in the petition because Mother had not disclosed his identity. Following a protective custody hearing on the 29th, the circuit court ruled that the protective custody order should remain in effect, and the children were placed in alternative care.

Mother gave Father's name to the Children's Division in January 2007. On February 5th, Father called the Division to give them his contact information. Deputy Juvenile Officer Erica Cox called Father on February 6th or 7th. She explained the Interstate Compact on the Placement of Children ("ICPC")[4] and told him that an adjudication hearing was scheduled for February 22. Father told Cox that he planned to attend the hearing. On February 7th, Cox filed an amended petition. It identified Father by name but did not contain any allegations against him. That same day, Cox sent a summons via certified mail to the address Father gave her. She also sent Father a letter via regular mail. Both advised Father of the hearing date and of his right to an attorney. A return receipt showed that Father received the summons on February 20.

2. Mother refers to her friend as her "Aunt." We therefore refer to her as "Aunt" herein.

3. Another of Mother's sons was living with the family of Aunt's cousin in Pettis County. The cousin and her husband ultimately became the prospective adoptive parents of all five of Mother's children.

4. The ICPC provides a means for states to cooperate with one another in the interstate placement of children, such that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment." *In re J.L.B.*, 280 S.W.3d 147, 156 (Mo.App.2009) (citing § 210.620, RSMo Cum.Supp.2007).

At the February 22nd adjudication and disposition hearing, the court heard testimony from Thomas Mefford, a psychologist who had diagnosed Mother as mildly mentally retarded and as having a schizotypal personality disorder. He opined that Mother would always need help to care for her children regardless of the services offered to her. The court determined that the Division had made reasonable efforts to keep the children in Mother's home but that the services offered were not adequate to insure proper care. The circuit court found that it had jurisdiction and that Child is in need of care and treatment due to Mother's mental condition, which renders her unable to provide proper and necessary care, and due to Mother's spanking of a two-month-old infant as discipline for crying. The circuit court ordered that Child be made a ward of the court with legal custody placed with the Children's Division for foster care.

Father was not present at the hearing. He did not arrive until shortly after the hearing had concluded due to being pulled over for a traffic stop on the way. Father asked to visit Child that day, and Julie Slocum, a Children's Division caseworker, arranged and supervised the visit. Father subsequently applied for two home studies under the ICPC, seeking to have Child placed in his custody in Illinois. The State of Illinois conducted both home studies and found in both instances that Father's home was unsatisfactory and not recommended for Child's placement. After the second home study was denied, the permanency plan was changed from reunification to termination of parental rights and adoption.

Father first requested an appointed attorney on April 14, 2008. On August 26, 2009, Father's appointed attorney filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, pursuant to the UCCJA, which the circuit court denied. Throughout the juvenile proceedings, Father and his attorney continued to file motions contesting the court's authority over the case.[5]

In the meantime, Child and her three siblings had been in foster care with Aunt's cousin's family (where their brother was already living) since September 2007. In March 2010, that family's attorney filed a petition to adopt all five siblings. Mother signed a consent to terminate her parental rights, allowing the children to be adopted. A decree of adoption was entered for Child's siblings in August 2010. Father was served with a petition in August 2010 requesting adoption of Child. That petition is on hold pending resolution of this case.

On May 7, 2012, the attorney for the Children's Division filed a petition to terminate Father's parental rights on grounds of abandonment, neglect, and failure to rectify, pursuant to section 211.447.5, RSMo [6] ("the termination case"). Father then sought a third home study, which the circuit court denied. Father thereafter filed several more motions, as well as continuance requests and motions to reschedule the hearing date. Following resolution of those matters, the case proceeded to a termination hearing on January 10 and 11, 2013.

---

5. In response to the denial of his motion to dismiss, Father filed a pro se Motion to Modify Judgment and Notice of Appeal on December 30, 2009. On August 9, 2010, he filed a pro se Motion to Stay for Lack of Convenient Forum and Motion to Reconsider. He filed a Motion to Set Aside the Adjudication Hearing and Dispositional Hearing on August 24, 2011. The court denied all of the motions.

6. Statutory references are to the Revised Statutes of Missouri (RSMo) 2000, as updated by the 2012 Cumulative Supplement, except where otherwise noted.

At the termination hearing, the court heard testimony from Mother and Father, as well as from Psychologist Mefford, who had counseled Child, Aunt, Child's foster mother, Caseworker Slocum, and Deputy Juvenile Officer Cox. Father's fiancée and various other family members also testified. The court denied Father's request to raise jurisdictional issues that the court had previously ruled upon. Mefford recommended termination of parental rights and adoption. The guardian ad litem submitted written suggestions recommending termination and adoption.

In its judgment of March 4, 2013, the circuit court found that the State had presented clear, cogent, and convincing evidence to support its allegations of abandonment, neglect, and failure to rectify. *See* § 211.447.6. The court found by a preponderance of the evidence that termination of Father's parental rights was in Child's best interests. *See id.*

This appeal follows.

## Discussion

■■■ On review of a termination of parental rights, we will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *In re K.A.W.*, 133 S.W.3d 1, 11 (Mo. banc 2004). We defer to the circuit court's superior ability to adjudge the credibility of the witnesses, and we view conflicting evidence in the light most favorable to the circuit court's judgment. *Id.* at 11–12. We review any alleged errors in applying the law *de novo. In re J.L.B.*, 280 S.W.3d 147, 152 (Mo.App.2009).

Father raises eight points on appeal. For ease of analysis, we address the points out of order, and we combine the points into three categories.

### Points Related to the Juvenile Case

Two of Father's points relate to the circuit court's rulings in the juvenile neglect case. Both raise questions of law, which we review *de novo. See id.*

In Point II, Father argues that the court erred in denying his Motion to Dismiss for Lack of Personal Jurisdiction and Lack of Subject Matter Jurisdiction or, in the Alternative, Motion to Transfer Venue and Motion for Forum Non Conveniens ("Termination Motion to Dismiss"), which he filed in the termination case. Father argues that the court in the juvenile case lacked the authority to determine custody under the UCCJA (in that Missouri was not the Child's home state and no emergency existed), and, thus, the court in the termination case also lacked such authority because a petition for termination is "derivative," in that section 211.452.1 requires the termination petition to be filed in the juvenile court that has prior jurisdiction over the child.

Two and one-half years after the February 2007 adjudication and disposition hearing, Father's attorney filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction on the basis that Illinois was the child's "home state" at the time of the adjudication and disposition order, pursuant to section 452.450.1(1) of the UCCJA, as Child had been in Missouri less than three months when taken into protective custody.[7] At the hearing on the motion, the juvenile officer stipulated that Illinois was Child's home state.

The circuit court denied the motion in a written judgment on November 5, 2009. The court ruled that because this is a civil case, the circuit court had subject matter jurisdiction pursuant to *J.C.W. ex rel.*

7. "Home state" is defined as "the state in which, immediately preceding the filing of custody proceeding, the child lived with his parents, a parent, an institution, or a person acting as parent, for at ... least six consecutive months[.]" § 452.445(4).

*Webb v. Wyciskalla*, 275 S.W.3d 249, 252–54 (Mo. banc 2009), in that the circuit courts have original jurisdiction over all cases and matters, civil and criminal, under article V, section 14, of the Missouri Constitution. The court found that it had the authority to issue a custody decree under section 452.450.1(2) because there was a "significant connection" to Missouri (in that Child and Mother were present in Missouri and the evidence relating to the Division's efforts to provide services to Mother and their lack of success was available only in Missouri), and under section 452.450.1(3) because Mother's neglect and stated intent to abandon the children created an "emergency." [8] The court ultimately denied Father's motion on the basis that he had not invoked any jurisdictional arguments or filed any motions contesting the court's assumption of jurisdiction until nearly three years after the adjudication and disposition order, and he therefore was barred from relitigating whether the court should have assumed jurisdiction. Father appealed that ruling.[9]

■ On September 12, 2012, Father filed his Termination Motion to Dismiss, raising the same allegations. Following a hearing, the court denied the motion on the basis that "the issues regarding the underlying [juvenile case] have been litigated" and "[Father] did not prevail." Here, Father concedes that the circuit court had subject matter jurisdiction, but he argues that the court in both the juvenile case and the termination case "lacked the authority to grant relief" because Illinois was Child's home state and the emergency provision in section 452.450.1(3)(b) was not applicable. *See Wyciskalla*, 275 S.W.3d at 255.

■ The circuit court did not err in denying Father's motion. There was no issue as to subject matter jurisdiction; [10] thus, the court's jurisdiction under the UCCJA was reviewable, if at all, when the adjudication and disposition order was entered in 2007. *See* Rule 81.04(a); *J.L.B.*, 280 S.W.3d at 154–55. By not appealing that order or seeking to set it aside until two and a half years after it was entered, Father is precluded from re-litigating that claim. *See Hightower v. Myers*, 304 S.W.3d 727, 736 (Mo. banc 2010); *see also In re S.L.*, 872 S.W.2d 573, 576 (Mo.App. 1994) ("res judicata should apply to a subsequent proceeding in a juvenile case, when the first adjudication on jurisdiction was not appealed"). The circuit court's denial of his Termination Motion to Dismiss is not a cognizable issue in this appeal. Point denied.

---

8. The four jurisdictional bases set forth in section 452.450.1 are commonly referred to as "home state, significant connection, emergency, and default or vacuum." *Hightower*, 304 S.W.3d at 732. By the time the Termination Motion to Dismiss was filed, the court's authority to act also was supported by the "default or vacuum" provision, under which the court may take jurisdiction over the case if it appears that no other state would have jurisdiction, or another state has declined to exercise jurisdiction. *See id.;* § 452.450(4). After the circuit court denied the motion to dismiss, the Children's Division learned that Father had filed a custody proceeding in Cook County, Illinois. In February 2010, the judge telephoned the Cook County judge, pursuant to section 452.465.3.

The Cook County judge stated that she had dismissed Father's custody proceeding on January 25, and she declined to take jurisdiction over the case under the UCCJA.

9. Father filed two notices of appeal: one on December 30, 2009, which it seems that he subsequently abandoned, and one on September 29, 2010, which was dismissed by this court for reasons that are not evident from the record. Father has not included either notice of appeal in his appendix or elsewhere in the record.

10. The significance of subject matter jurisdiction is that the issue may be raised at any time. *See S.L.*, 872 S.W.2d at 576.

■ In Point III, Father argues that the circuit court erred in overruling his Motion to Dismiss in the termination case because he was not afforded minimum due process in the juvenile case,[11] in that he was not given adequate notice of the February 2007 adjudication hearing. Father cites *In re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), for the proposition that due process requires written notice to be given "at the earliest practicable time" and "sufficiently in advance [to afford] a reasonable opportunity to prepare." Father claims that, under the circumstances of this case, forty-eight hours notice for a hearing some 450 miles away was in violation of due process.

In August of 2011, Father's attorney filed a Motion to Set Aside the Adjudication and Dispositional Hearing based on a lack of personal jurisdiction. Father claimed that he did not receive adequate notice of the adjudication hearing. The court denied the motion. The court correctly found that Father was properly served and had adequate notice. The State complied with Rule 115.01(d) (then in effect), which states that "[p]ersonal service shall be effected upon … the juvenile's custodian at least twenty four hours before the time set for hearing. Registered or certified mail shall be mailed at least five days before the time of the hearing." On February 7th, Cox mailed the summons via certified mail, but, for whatever reason, Father did not receive it until February 20th, two days before the hearing. She also telephoned Father on February 7th to tell him about the hearing and sent him a letter about the hearing via regular mail.

■■ The circuit court also found that Father had waived his right to contest personal jurisdiction on the basis of a lack of due process. We agree. Such constitutional assertions must be raised "at the first available opportunity" and preserved "throughout the proceedings." *J.L.B.*, 280 S.W.3d at 159. By failing to do so, Father failed to preserve his due process arguments for our review. *Id.* Moreover, by taking part in the proceedings for over two years before contesting the court's finding of jurisdiction, Father subjected himself to the court's jurisdiction, thereby waiving any objection as to a lack of personal jurisdiction. *See C.J.G. v. Mo. Dept. of Social Servs.*, 219 S.W.3d 244, 248 (Mo. banc 2007) (a "claim of lack of personal jurisdiction may be waived when a defendant makes no motion or pleadings on the issues but otherwise subjects himself to the jurisdiction of the court"). Point denied.

### Points Related to Pre-trial Rulings in the Termination Case

■ In Point IV, Father argues that the circuit court committed reversible error by not conducting a hearing within thirty days after the juvenile officer and the court met, as mandated by section 211.459, RSMo. He notes that compliance with the statutes governing procedure in juvenile courts is mandatory, and a failure to strictly comply with the applicable provisions of Chapter 211 constitutes reversible error. *See K.A.W.*, 133 S.W.3d at 16–17. We review this question of law *de novo*. *J.L.B.*, 280 S.W.3d at 152.

Section 211.459.1 provides that "[w]ithin thirty days after the juvenile officer and

11. "Due process encompasses those guarantees found in the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 10 of the Missouri Constitution." *C.J.G. v. Mo. Dept. of Social Servs.*, 219 S.W.3d 244, 247 n. 5 (Mo. banc 2007). A "fundamental requirement of due process … is notice reasonably calculated … to apprise interested parties of the pendency of the action[.]" *Id.* at 248.

the court have met pursuant to section 211.455, the court shall hold the dispositional hearing[.]" Here, the State filed its petition to terminate on May 7, 2012. The court met with the juvenile officer on May 23, 2012, at which time the court ordered an investigation and social study, all in compliance with section 211.455. However, the hearing did not occur until January 10, 2013, almost seven months after the statutory thirty-day time period would have expired.

Pursuant to Rule 125.03(a)(4), a dispositional hearing must be held within thirty days after the section 211.455 meeting, "unless continued for good cause." Here, the circuit court had good cause for not holding a hearing within thirty days because Father sought and agreed to a dispositional hearing more than thirty days after the meeting. *See In re A.D.G.*, 23 S.W.3d 717, 719 (Mo.App.2000) (agreement as to continuance waives thirty-day deadline for dispositional hearing). When the court and juvenile officer met on May 23, the circuit court properly set the case for trial on the "juvenile docket day following return of service on all parties." Between that meeting and the trial, Father repeatedly delayed the trial setting by asking for additional time to file his answer, which was granted; moving for a change of judge, which was denied; filing a pro se motion to recuse and motion to dismiss the termination petition, both of which were argued and denied; moving for a continuance, which was denied; and again moving for continuance due to a death in counsel's family, which the court granted. The court reset the trial date for November 30 and December 3, 2012. Father then moved to reschedule because he wanted a trial on consecutive days. The court rescheduled for January 10 and 11, 2013, when it was tried.

■ We recognize that custody issues should be disposed of "expeditiously." *In re G.G.B.*, 394 S.W.3d 457, 463 (Mo.App. 2013). However, after repeatedly filing motions and requesting continuances and rescheduled trial dates, Father's claim that the court committed reversible error by failing to hold a timely hearing because it granted his requests is without merit. Point denied.

■ In Point I, Father argues that the circuit court erred in overruling his September 12, 2012, pro se Motion to Recuse. He claimed in his motion that a reasonable person likely would doubt the impartiality of the judge who presided over the case because he had been named by Father as a defendant in two federal lawsuits and was the subject of an ethics complaint that Father filed with the Missouri Commission on Retirement, Removal and Discipline.

■ "A denial of a motion for change of judge is reviewed for an abuse of discretion." *In re K.L.W.*, 131 S.W.3d 400, 404 (Mo.App.2004). It is an abuse of discretion if the decision "defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration." *Id.* It is presumed that a judge will not hear a matter if he cannot be impartial, and we defer to the circuit court's decision. *In re B.R.M.*, 111 S.W.3d 460, 462 (Mo.App.2003). A judge has an affirmative duty not to disqualify himself from hearing a case unnecessarily. *Id.*

At the hearing on the motion, the judge seemed to be unaware of the lawsuits and ethics complaint prior to Father's motion to recuse. Father complained that the judge had "denied all the motions that I've presented," and he claimed that when he arrived late to court on February 22, 2007, the judge gave him legal advice to ask for a home study or move to Missouri. The judge flatly denied that he had given Fa-

ther any legal advice. The court denied the motion.

 Father relies on *Robin Farms, Inc. v. Bartholome*, 989 S.W.2d 238, 246 (Mo.App.1999), which states that a judge "must recuse in any proceeding in which his or her impartiality might reasonably be questioned by reason of actual bias and prejudice or an appearance of impropriety," citing Rule 2, Canons 2 and 3. The test is "whether a reasonable person would have factual grounds to doubt the impartiality of the court." *Id.* To be disqualifying, any alleged bias or prejudice "must stem from an extrajudicial source." *Id.* at 247. Father claims that the two federal lawsuits and his ethics complaint qualify as an "extrajudicial source." We disagree. Those filings consist primarily of complaints about the judge's rulings against Father. "The mere fact that rulings are made against a party does not show bias or prejudice on the part of the judge." *Id.* Moreover, if filing a lawsuit or complaint against a judge warranted disqualification, then any party wishing to have a change of judge at any point in the proceedings need only file such a lawsuit or complaint. This only invites abuse of process and is no basis for disqualification.

In sum, Father does not show that the judge presiding over this case abused his discretion in refusing to disqualify himself.[12] The court did not demonstrate a personal enmity toward Father that was derived from an extrajudicial source and that resulted in termination of Father's parental rights for any reason other than the evidence presented. Point denied.

### Points Related to the Termination Decision

In Points V–VII, Father contends that the circuit court erred in terminating his parental rights on grounds of abandonment, neglect, and failure to rectify. § 211.447.5.

 Section 211.447.6 provides that in order to terminate parental rights, the circuit court must find by clear, cogent, and convincing evidence that at least one of the grounds set forth in section 211.447.2, .4, or .5 exists. Clear, cogent, and convincing evidence is evidence that "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *A.M.S.*, 272 S.W.3d at 308. After the court finds that a ground for termination exists, it then must determine, by a preponderance of the evidence, whether termination is in the child's best interest. *See id.*

 On appeal, we examine the record to determine whether the circuit court's grounds for termination were supported by "clear, cogent and convincing evidence." *See In re B.J.K.*, 197 S.W.3d at 237, 242–43 (Mo.App.2006). We view the evidence in the light most favorable to the judgment and disregard any evidence or inferences to the contrary. *Id.* at 247. The termination of parental rights "is an awesome power that involves fundamental liberty interests," thus, we review the record very closely, and we strictly construe the statutes in favor of preservation of the natural parent-child relationship. *In re*

---

**12.** In his argument, Father cites two statements that the judge made in open court: "I don't want to split these kids up" and "this child is probably going to be adopted." Father claims these are evidence of *"actual* impartiality, bias or prejudice." Father's motion did not refer to these statements, nor did he bring them up at the hearing, and the issue was not raised in his point relied on (*see* Rule 84.04(d), (e)); thus, we need not address them. Suffice it to say that, when viewed in context, these statements do not demonstrate bias, prejudice, or a predisposition in the case.

*J.M.T.,* 386 S.W.3d 152, 158 (Mo.App. 2012).

The circuit court found that there was clear, cogent, and convincing evidence to support termination of Father's parental rights on three grounds: that the child had been abandoned (§ 211.447.5(1)(b)); that the child had been neglected (§ 211.447.5(2)(d)); and that a condition of a potentially harmful nature continued to exist and there is little likelihood that the condition will soon be remedied so that the child can be returned to Father (§ 211.477.5(3)) (a "failure to rectify"). Father contests the circuit court's findings as to all three grounds.

▮▮▮ We turn first to Father's claim, in Point VI, that the circuit court erred in finding that there was sufficient evidence to support termination on the basis of neglect. Section 211.447.5(2) authorizes a circuit court to terminate parental rights if "[t]he child has been abused or neglected." "Courts define neglect as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *In re M.J.H.,* 398 S.W.3d 550, 561 (Mo.App.2013). "Neglect sufficient to support termination must 'be based on conduct at the time of termination, not just at the time jurisdiction was initially taken.' " *Id.* (quoting *K.A.W.,* 133 S.W.3d at 10).

▮▮▮ In determining whether to terminate parental rights based on neglect, the circuit court must consider and make findings on four factors. § 211.447.5(2)(a)-(d). Those factors can be summarized as (a) a mental condition, (b) a chemical dependence, (c) a severe or recurrent acts of abuse, and (d) repeated or continuous failure by the parent, although physically or financially able, to provide for the child. *See id.* "These four factors are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *M.J.H.,* 398 S.W.3d at 560. Nevertheless, proof of one of these factors is sufficient to support termination on the statutory ground of neglect. *Id.*

▮▮▮ Here, the circuit court found that there was no evidence as to the first three factors but that termination was authorized on the basis of paragraph (d): "Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development." § 211.447.5(2)(d). "Neglect is ultimately a question of an intent to forego parental duties, which includes both an obligation to provide financial support for a minor child, as well as an obligation to maintain meaningful contact with the child." *In re J.M.J.,* 404 S.W.3d 423, 432 (Mo.App.2013) (internal quotation marks omitted).

▮▮▮ Viewed in the light most favorable to the judgment, the evidence at trial showed that Father had visited Child in person only four times since she came into protective custody in December 2006. His last visit was one and one-half years before the termination hearing. The four in-person visits lasted a combined total of less than five hours. Father did not send cards or letters to Child with the exception of one letter that he sent through his attorney in July 2010.[13]

Initially, the foster parents allowed Father to telephone Child directly, but Father did not call regularly, and when he

---

**13.** On the day of trial, Father brought letters that he had written, but not mailed, to Child.

did call, it often was after the children had gone to bed. Between May 2008 (when the Children's Division told Father's attorney that Father needed to start directing his calls through the Division) and September 2010, Father requested no telephone visitation with Child. Beginning in September 2010, Father and the family support team agreed that Father would call Child on a monthly schedule. Father had a telephone visit with Child in September 2010, but thereafter he took part in only eight of the sixteen scheduled visits. The Division mailed Father three written services agreements, with stamped, self-addressed return envelopes, that focused on visitation. Father never signed and returned any of the agreements.[14]

Section 211.447.8 states that "[t]he court may attach little or no weight to infrequent visitations, communications, or contributions." In other words, the court does not have to give effect to what it sees as "token gestures." *In re B.J.H., Jr.*, 356 S.W.3d 816, 826–27 (Mo.App.2012) (averaging one visitation per month in the six months preceding petition was clear, cogent, and convincing evidence of failure to make arrangements to visit or communicate with children). Here, the circuit court properly gave little weight to Father's token efforts to visit and communicate with Child.

The circuit court also properly considered the fact that Father did not contribute any monetary support for Child after she came into protective custody; nor did he contribute any other support, such as clothing, meals, or gifts. At trial, Father testified that he gave Child some money when he visited but had not provided any other financial support.[15] Father testified that he had no physical or mental condition that prevented employment. The evidence at trial showed that he had been employed at various jobs during the pendency of the case and that he has a paralegal degree. Father's fiancée testified that Father had been employed full time for the past two years.

■ "The financial support of a minor child is a continuing parental obligation[,] and a parent has a duty to contribute as much as he or she can … even in the absence of a demand for payment." *M.J.H.*, 398 S.W.3d at 561(internal citations and quotation marks omitted). Unless there is evidence that Father is incapable of employment or is physically unable to provide for his child (which does not exist here because he was employed), Father is considered to be financially able to support his child. *See G.G.B.*, 394 S.W.3d at 473. The circuit court found the gifts Father brought to trial and the money

---

14. We concur with the circuit court's observation, in rejecting Father's claim that the State failed to prove his intent to neglect or abandon Child, that:

> The Court has chronicled [Father's] refusal to sign Written Service agreements, to conduct telephone visits, to provide support for his daughter, to participate in family support team meetings, to send mailings or presents to her. He appears to have been more interested in contesting matters with the kinship providers than having a real relationship with his daughter. He testified as to his intent to avoid being blamed for his contacts with his daughter and to have declined to send needed support because he

had never been ordered to pay it. He decided to pursue his legal rights and contentions rather than to relate appropriately with his daughter.

Similarly, we also agree with the guardian ad litem's observation that:

> Father asserts that he has not abandoned the child because he has filed multiple motions with this Court in an attempt to get his child back. While it is true that Father has filed motions, this is a legal strategy and is not a substitute for the missed opportunities to visit and correspond with the child.

15. On the day of trial, Father brought gifts that he had been saving for Child.

given during visitation to be token gestures. *See* § 211.447.8. Accordingly, the court properly determined that there was clear, cogent, and convincing evidence that Father had failed to provide parental support without good cause.

The evidence also showed that Father neglected Child by failing to provide an appropriate residence. *See B.J.H., Jr.,* 356 S.W.3d at 828 (repeated or continuous failure to provide suitable housing can constitute neglect sufficient to terminate parental rights). Father requested, and the Division arranged, two separate home studies under the ICPC. The State of Illinois conducted the first home study in August 2008 and the second in October 2009. Both were denied.[16] Caseworker Slocum testified that the Division could not place physical custody of Child with Father under the ICPC because Illinois had "denied" the home studies.[17] The circuit court denied Father's request for a third home-study, which he filed in June 2012 after the termination petition had been filed. The court also found that Father's evidence as to his residence at the time of trial was not credible, in that he never produced a signed lease for that, or any other, residence, and he testified that he had paid only one month's rent, with two month's rent forgiven, and received his mail at a different address (the address, incidentally, where Father's sister testified that he lived). The court was free to believe all, part, or none of Father's testimony. *See J.M.T.,* 386 S.W.3d at 158.

The circuit court stated that "an essential part of [its] determination as to whether to terminate parental rights based on neglect is the impact of Father's conduct on Child." *See B.J.H., Jr.,* 356 S.W.3d at 828–29 (repeated or continuous failure to provide emotional support can constitute neglect sufficient to terminate parental rights). The court explained that the impact is apparent from Psychologist Mefford's testimony that Child suffers from confusion and anxiety due to Father's inconsistent behavior and unkept promises, which have caused disappointment and emotional turmoil. According to Mefford, the delay in the adoption proceeding has caused Child to develop an adjustment disorder, and she has expressed her desire that Father let her be adopted. Mefford discontinued therapy because he thought that talking about the situation only added to Child's distress. He found that Child has never had a bond with Father but that she has a close bond with her foster parents and is close to her four siblings.

Father's lack of effort to visit, communicate with, and establish a relationship with Child, and his failure to contribute anything toward her support, in spite of being capable of and obtaining employment, constitutes neglect. After a thorough review of the record, we find that the circuit court's finding that clear, cogent, and convincing evidence supported the termination of Father's parental rights based on neglect is sufficiently supported by the record.

Although only one statutory ground need be proven to support termination, we have reviewed each basis on which the circuit court relied and find that the evidence supports termination as to all three grounds.[18] *See B.J.H., Jr.,* 356 S.W.3d at

---

16. Father includes the home studies in his appendix, but they were not admitted at the termination hearing. The foregoing information about the home studies is taken from Slocum's testimony at trial.

17. We presume that Slocum was referring to article VI, section B, of § 210.620, which states: "If the public child-placing agency in the receiving state does not approve the proposed placement then the child shall not be placed."

18. In Point V, Father contends that the circuit court erred in finding that sufficient evidence existed to establish abandonment as a basis for terminating his parental rights. Parental rights may be terminated if a child over the

825. Viewing the evidence in the light most favorable to the judgment and deferring to the circuit court's factual findings and credibility determinations, we find that there is clear, cogent, and convincing evidence sufficient to support termination of Father's parental rights on each of the grounds found by the circuit court. Points V–VII are denied.

■■■■ In his final point, Father contends that the circuit court abused its discretion in finding that termination of his parental rights was in Child's best interest. As noted, after finding the existence of a statutory ground supporting termination of parental rights, the circuit court must determine, by a preponderance of the evidence, whether termination is in the child's best interest. § 211.447.6. This is a "subjective assessment based on the totality of the circumstances[,]" and we review for an abuse of discretion. *In re M.L.R.*, 249 S.W.3d 864, 869 (Mo.App.2008). We defer to the circuit court's findings of fact and consider the evidence and its reasonable inferences in the light most favorable to the judgment. *A.M.S.*, 272 S.W.3d at 310.

In making the best interests determination, the circuit court must evaluate and make findings, where applicable, on the seven factors listed in section 211.447.7.

"There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *B.J.H., Jr.*, 356 S.W.3d at 834.

Here, the circuit court made the following findings pursuant to section 211.447.7: (1) the ties between Father and Child did not establish a bond and no bond currently exists, (2) Father has been sporadic and neglectful in exercising visitation, telephone contact, or written communication with Child, (3) Father has without good cause failed to provide any significant support for Child for over five years, (4) no additional services which the juvenile office or the Children's Division could provide would be likely to bring about a lasting parental adjustment, (5) Father's actions are probative of a lack of commitment to Child, (6) Father has no felony convictions, and (7) the court finds no evidence of any deliberate acts by Father that subjected Child to any substantial risk of physical or mental harm but finds that his omissions "were emotionally and mentally harmful and deliberate." The circuit court concluded, based on its subjective assessment of the totality of the circumstances, that "it is abundantly clear that it is in Child's best

---

age of one has been "abandoned." § 211.447.5(1)(b). The circuit court found that Father's lack of effort to visit, communicate with, and establish a relationship with Child, and his failure to contribute support, evidenced his intent to abandon her. We agree. We find that the same clear, cogent, and convincing evidence that supported termination on grounds of neglect also supported termination on grounds of abandonment.

In Point VII, Father argues that the circuit court erred in finding that sufficient evidence existed to establish that a "failure to rectify," under 211.447.5(3), constituted a basis for terminating his parental rights. The circuit court found that: (1) the child had been un-

der the jurisdiction of the court for at least one year, (2) "conditions of a potentially harmful nature continue to exist" with regard to Father's current living conditions (*see B.J.H., Jr.*, 356 S.W.3d at 832), and (3) there is little likelihood that the conditions of Father's home or his suitability as a placement will be remedied at an early date, and the continuation of the parent-child relationship greatly diminishes Child's prospects for integration into a stable and permanent home. After a careful review of the evidence, we conclude that the same clear, cogent, and convincing evidence that supports the court's findings of neglect and abandonment also supports termination of Father's parental rights on the basis of a failure to rectify.

interest that Father's parental rights be terminated." We agree.

The facts discussed in our analysis of the grounds for termination demonstrate that the record supports the circuit court's findings as to its best interest determination. Child had been in foster care for over six years during which there had been minimal contact between Father and Child; Child lacks a bond with Father; Father did not provide financial support; Father failed to sign and return the service agreements; and Father demonstrates a lack of commitment to Child. Based on our review of the entire record, we conclude that the best interest factors were proven by a preponderance of the evidence, and we find no abuse of discretion in the court's judgment that termination is in Child's best interest. Point denied.

We affirm the circuit court's judgment.

All concur.